**Opinion issued March 31, 2026.**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-24-00212-CR

———————————

**CORY CORNELL PARKER, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 177th District Court**
**Harris County, Texas**
**Trial Court Case No. 1643461**

---

## MEMORANDUM OPINION

The jury found Appellant Cory Cornell Parker guilty of murder and the trial court assessed his punishment at seventy-seven years' confinement in the Texas Department of Corrections – Institutional Division. In three issues, Appellant argues (1) the trial court abused its discretion by finding that he voluntarily absented himself

from trial and proceeding with trial in his absence thus denying him his constitutional and statutory rights to be present during trial, (2) his trial counsel rendered ineffective assistance because he did not file a written motion for continuance or a writ of attachment, and (3) the trial court erred in assessing court costs.

We affirm the trial court's judgment.

## Background

It is undisputed that on August 22, 2019, Appellant Cory Cornell Parker shot Marcus Ealy in the chest at close range, killing Ealy. Parker argued at trial that he shot Ealy in self-defense. The State rested its case at the end of the second day of testimony on Friday, March 8, 2024. The trial court instructed the parties and witnesses that trial would reconvene at noon on Monday, March 11, 2024, at which time the defense would put on its case-in-chief.

Parker, who had been present during jury selection and the State's presentation of its case-in-chief on March 8, was not present in the courtroom when trial was scheduled to resume on March 11. At approximately 12:20 p.m., the trial court made a record concerning Parker's absence and the absence of his witness Christopher Arroyo.[1] With respect to Parker, defense counsel informed the court that

---

[1]    Trial was not scheduled to resume until noon on March 11 because the court reporter was not available until noon. As a result, no bench conference that occurred prior to noon on March 11 is included in the record. Trial counsel testified that after the

2

Parker had texted him at approximately 7:15 a.m. that morning informing him that he was being transported to the hospital via ambulance for chest pains and nausea. Defense counsel, who did not see Parker's text until around 8:15 a.m., advised the court and the prosecutor of the texts at approximately 9:30 a.m. Defense counsel told the court:

> I'm not representing to the Court that's his diagnosis, because I don't know what his diagnosis is. He has texted me back and forth. I have asked him for the details. I have informed him that we are set to resume and start the presentation of his case today at noon as the Court is well aware and how important it was that I get the particulars so I could relate those to the Court. He relates to me that the doctor has not called him back, yet. In spite of my request to get all the particulars, including the start time of symptoms, arrival time at the ER, prior conditions he may have which might be implicated by the symptoms he has this morning and the prescription medications he might be on, which likewise could possibly be implicated. In short, I wanted to give the Court as much information as possible. Also, including the address of the hospital, the phone number of the ER, names of the head nurse and the treating physician and when he would be released to return to court.

Defense counsel read into the record a text message he sent to Parker and his investigator Mike Peterson at 10:30 a.m. requesting this information.

Defense counsel had also contacted Parker's mother, but she did not provide a meaningful response other than to confirm that Parker was at the hospital, and she told defense counsel that she would come to court at noon to speak to the trial court.[2]

---

court reporter arrived, "both sides put all matters that had been addressed outside the presence of the Court Reporter and everything that had occurred that day on the record."

[2] Parker's mother did not appear for court on March 11.

When asked for details regarding Parker's condition and treatment, Parker's mother told defense counsel that Parker would "get a discharge paper and the Judge will find out everything he needs to know there."

According to defense counsel, Peterson had also reached out to Parker, Parker's mother, and Parker's girlfriend. Peterson left messages for Parker's mother and girlfriend, but he was unable to leave a message on Parker's phone. Defense counsel told the court that he had not received the requested information from Parker and Peterson also had been unsuccessful in securing the information.

Defense counsel told that court that although he had not been able to speak with Parker, Parker had just informed him that he could talk on the phone and counsel asked the court for a "brief continuance or at least for the Court to, I guess, talk to the Defendant and decide for itself whether or not to continue the trial in his absence." The trial court declined to speak to Parker on the phone because "a lot of times you don't know who you're talking to on the other end of the telephone." The trial court judge stated:

> My only concern is that you have tried, your investigator has tried to get specific information from your client about the hospital he's at, how long he's anticipated on being there and he has not provided you any of that information. And, once again, he initially reached out to you at 7:15 this morning. The time now is 12:35 and you still have not gotten that specific information. So I'm concerned—the Court is concerned that this is all a tactic for delay.

4

With respect to Parker's witness, Arroyo, defense counsel informed the trial court that Arroyo had been present for trial on Friday, March 8, and he waited for five hours to testify for the defense before being instructed to return at noon on March 11 when the defense would present its case-in-chief. Defense counsel stated that Arroyo would be the defense's only witness unless Parker appeared and chose to testify. He advised the court that he needed Arroyo's testimony because Arroyo was the only witness who could testify regarding Ealy's character trait for violence, and as the "sponsoring witness" for a photo of Ealy holding a gun and making "some kind of sign" with his hands. Defense counsel told the court that although he had not attempted to contact Arroyo that day, his investigator had called Arroyo, but Arroyo had not returned the investigator's calls. Defense counsel moved for a continuance until the next morning in the event Arroyo "will somehow come out of the woodwork and be presented in court." Defense counsel stated:

> It's not a written motion [for continuance], I get that, but I expected him here today. We had this conversation on Friday, a long conversation with my investigator and Mr. [Arroyo]. He's supposed to be here. . . . And in fairness to Mr. Arroyo he did tell me he had some interview. But I explained to him he's the only witness I have to prove up the salient pertinent traits. Without him I cannot present those. He knew that. He knew he is subject to attachment for trial. But nonetheless, he is gone.

The trial court denied both oral motions for a continuance and the jury was seated at 1:10 p.m. After the State rested its case, defense counsel recalled one of the State's witness, Roderick Chretin, who identified Ealy as the person who was

5

holding a gun in a photograph admitted as Defense Exhibit 8. The defense rested its case subject to closing after Chretin testified.

Outside the jury's presence, defense counsel re-urged the need for a one-day continuance to secure Arroyo's appearance and told the trial court:

> Judge, I can't get [Arroyo] attached in time to continue this this afternoon. So if the Charge is going to be read to the jury, then there's nothing I can do about that. I know he's been subpoenaed. I know he agreed to be here. I know he is attachable if I can find him. But it wouldn't happen within the constraints of getting to this jury today. At least, I have no reason to believe it would. I would not represent to the Court I could accomplish that if I thought I could not.

The trial court denied the motion for continuance and at 1:39 p.m. the court recessed for lunch. At 2:33 p.m., the trial court brought the jury back to the courtroom, charged the jury, and heard closing arguments, which concluded at 3:50 p.m. Parker was not present at 3:50 p.m. when the jury began deliberating, but he was present at 4:15 p.m. when a jury note was read into the record.

The jury found Parker guilty of murder at 6:00 p.m. on March 11, and after a punishment hearing the following day, the trial court assessed Parker's punishment at seventy-seven years' confinement.

### Motion for New Trial

Parker filed a timely motion for new trial in which he argued that the trial court committed material error in finding that Parker had voluntarily absented

himself from trial and that his trial counsel rendered ineffective assistance.[3]Parker and his trial counsel were the only witnesses to testify at the hearing on the motion for new trial.[4]

## A.  Defense Counsel

With respect to Parker, defense counsel testified that Parker told him he had gone to the hospital and he "said something about a daughter being born or a son being born and then he had chest pains as well." When asked if Parker told him this while at the hospital, defense counsel testified:

> I don't recall. I don't know where he was. I remember bringing it to [the] Judge's attention that he wasn't voluntarily absenting himself from the courtroom, I believe. I thought that a brief continuance was indicated, so the jury wouldn't be looking at an empty table. But [Parker] had not been in communication with me as to certain particulars and I gave him ample opportunity to do that. At least, I thought he had. And I just thought he had decided to check himself out for a little while. I didn't know for sure, obviously.

Defense counsel testified that when Parker contacted him, he reminded Parker that he needed to be at the courthouse by noon on Monday when trial was scheduled to resume. He confirmed that he put on the record both his and his investigator's efforts to obtain details regarding Parker's absence.

---

[3]  *See* TEX. R. APP. PROC. 21.3(b) (stating defendant must be granted new trial when court committed "material error likely to injure the defendant's rights").

[4]  Although Parker alleged multiple grounds for ineffective assistance, the recitation of facts in this opinion is limited to the grounds asserted on appeal and Parker's absence from trial.

In response to questions from the trial court, defense counsel testified that he was told Parker was having chest pains, but he did not know what hospital Parker was in or the actual diagnosis Parker was given when he spoke to the trial court, and he did not have any specific information that could have been verified at that time. Defense counsel testified that Parker told him he was having chest pains, and he denied that Parker failed to appear for court on March 11 because his girlfriend was giving birth the same day. Counsel did not specifically recall whether he had attempted to reach Parker by calling him, but he knew Parker had responded via text, and he believed his investigator also tried to locate Parker. He did not know if Parker had contacted the court staff directly. Defense counsel testified that he believed Parker had arrived at the courthouse after the jury began deliberating Parker's guilt or innocence. He could not remember whether Parker provided him with written documentation from the hospital when he arrived.

With respect to Arroyo, defense counsel testified that Arroyo appeared for trial on Friday, March 8, but he did not return to testify on March 11 as he had been instructed to do. According to defense counsel, Arroyo was "just unavailable," and he was not returning phone calls. He testified that he thought he had subpoenaed Arroyo, but he was not sure. When asked why he would have subpoenaed Arroyo, defense counsel testified:

> My impression [is that] the value of Mr. Arroyo's testimony could not
> have only touched on the propriety of Mr. Parker's apprehension of fear

8

or danger, but I think more importantly his use was going to be to insure the admissibility of some extremely prejudicial photographs that showed [Ealy] holding a firearm and things of that nature which flew in the face of some testimony elicited by the State and their direct of some of these people that was somewhat contextual. They weren't scene witnesses necessarily, but I needed to correct what I believe to be a false impression left with the jury about the [Ealy's] character. And thankfully they had somehow opened the door to get those photographs into evidence without Mr. Arroyo's presence if I recall. So at least I've had the solace of getting as much in as I could without Mr. Arroyo being available. And, thankfully, I think the Judge saw that it was indicated to let those things into evidence as well. So, obviously, because they did come into evidence. And I also think Mr. Arroyo may have had some kind of criminal history. I don't recall exactly.

When asked why he had not requested a writ of attachment given the significance of Arroyo's anticipated testimony, defense counsel testified that he "didn't think that attachment would actually get him present here during the trial."

## B. Parker

Parker testified that he did not appear for court at noon on March 11 because he was being treated at St. Joseph's Medical Center primarily for chest pains. According to Parker, he was transported by ambulance to the hospital around 7 to 7:30 a.m. that morning because he was experiencing shortness of breath and pain in his chest, back, and leg. He believed he was having a heart attack. Parker rated his chest pain as a 9 on a 10-point scale. He also testified that he was light-headed, dizzy, and unable to walk unassisted when he went to the hospital.

According to Parker's medical records, he told medical personnel when he arrived at the hospital at around 7:38 a.m. that he began experiencing chest pains

9

after he was injured in a football game with his children the day before and his chest pains began again after his pregnant girlfriend's water broke that morning. Parker's girlfriend was transported to St. Joseph's Medical Center in a separate ambulance and Parker asked EMS personnel to transport him to the same hospital as his girlfriend. When he arrived at the hospital, Parker rated his chest pain as a 4 on a 10-point scale, and he denied having chest pains when he spoke to medical personnel about fifteen minutes later. Although Parker testified that he was light-headed and dizzy when he went to the hospital, his medical records reflect that he denied any nausea, vomiting, dizziness, or shortness of breath. Parker was given an aspirin for his pain and "discharged home as no acute need for admission" at 1:40 p.m.

Parker testified that he was only able to text his counsel while he was being transported to the hospital and he could not use his phone after he arrived at the hospital until 8:30 a.m. because medical personnel were taking his medical history and running tests. According to Parker, he could make telephone calls while he was at the hospital, but his cell phone was dying, and he was having trouble charging the battery. Parker testified that although his defense counsel started asking him for more detailed information around 9:30 a.m., he did not provide his counsel with any additional information aside from the name of the hospital. Defense counsel's investigator called Parker's cell phone while he was being discharged from the

10

hospital, and Parker handed his phone to the nurse who told him "everything" including where Parker was located and when he would be discharged.

Parker did not know the exact time he was discharged, but he believed it was around 3:00 p.m. and he initially testified that he immediately went to court after he was released. On further questioning, Parker stated that he was unable to leave the hospital right away because he had to wait for about an hour until his girlfriend's sister arrived to give him a ride to the courthouse. Parker told the trial court:

> I tried to find a ride. I wanted to walk, but I don't think [defense counsel] wanted me to walk. So I tried to find the first ride back here. That's what took me so long.

When asked why he did not ask his defense counsel for a ride, Parker stated that he did not "think they were going to pick me up. I didn't know. No, sir. [Defense counsel] kept suggesting I need to get to court as soon as I could. And that's what I was doing. I was texting literally everybody and calling everybody."

According to Parker, he told defense counsel that he had to "wait for somebody to come and give me a ride" to court and when he arrived at court, he gave defense counsel written documentation from the hospital. Parker did not remember the exact time he arrived at court, but when he arrived, the jury was already deliberating his guilt. Parker testified that he continued to have chest pains even after he was taken into custody.

After reviewing the records and hearing the parties' closing arguments, the trial court denied Parker's motion for new trial.

This appeal followed.

## Parker's Absence from Trial

In his first issue, Parker argues the trial court denied him his constitutional and statutory rights to be present during trial by finding that he voluntarily absented himself from trial and by trying him in absentia.

## A.     Standard of Review and Applicable Law

A defendant's right to be present in the courtroom at every stage of trial is guaranteed by the confrontation and due process clauses of the United States Constitution and the Texas Constitution. *See* U.S. CONST. amend. V, VI, XIV; TEX. CONST. art. I, §§ 10, 19; *see also Lira v. State*, 666 S.W.3d 498, 511 (Tex. Crim. App. 2023). The right to be present in the courtroom is also codified in Article 33.03 of the Texas Code of Criminal Procedure. TEX. CODE CRIM. PROC. art. 33.03.[5] A defendant, however, may waive this right by voluntarily absenting himself from trial.

---

[5]     Texas Code of Criminal Procedure article 33.03 provides:

> In all prosecutions for felonies, the defendant must be personally present at trial. . . .provided, however, that in all cases, when the defendant voluntarily absents himself after pleading to the indictment or information, or after the jury has been selected when trial is before a jury, the trial may proceed to its conclusion.

TEX. CODE CRIM. PROC. art. 33.03.

12

*See Hughes v. State*, 691 S.W.3d 504, 518–19 (Tex. Crim. App. 2024) (stating "this Court and the courts of appeals have long treated the right to be present as subject to waiver (typically by the defendant's voluntary absence) regardless of the particular basis for the right, whether statute, the Confrontation Clause, or even the Due Process Clause").

We review a trial court's holding that a defendant voluntarily absented himself from trial under an abuse of discretion standard. *Yonko v. State*, 702 S.W.3d 844, 852 (Tex. App.—Houston [1st Dist.] 2024, pet. ref'd) (citing *Moore v. State*, 670 S.W.2d 259, 261 (Tex. Crim. App. 1984)). A trial court does not abuse its discretion by proceeding with trial if some evidence supports a conclusion that a defendant's absence is voluntary. *See Moore*, 670 S.W.2d at 261. In reviewing such a decision, we may consider not only the evidence before the trial court at the time it issued its ruling but also any later-developed evidence. *Id.* We will not disturb the trial court's finding unless the defendant presents evidence that refutes the trial court's determination. *Id.* We defer to the trial court's assessment of a witness's credibility and resolution of evidentiary conflicts. *See Davis v. State*, No. 07-19-00228-CR, 2020 WL 465855, at *1 (Tex. App.—Amarillo Jan. 28, 2020, pet. ref'd) (mem. op., not designated for publication) ("In essence, the finding [of voluntary absence] is factual which obligates [the appellate court] to defer to the trial court's ability to assess a witness's credibility and resolve evidentiary conflicts.").

**B.     Analysis**

Parker argues that he refuted the trial court's finding that he voluntarily absented himself from trial on March 11 because the evidence demonstrates that he was transported to the hospital that morning at around 7:30 a.m., where he was treated for chest pains until he was discharged at 1:40 p.m. Parker testified that his chest pain when he went to the hospital was a 9 on a 10-point scale and he reported a pain level of 4 while at the hospital and the pain was described as being "pressure type."

Parker testified that he could not get to the courthouse immediately after his discharge from the hospital because he did not have transportation and he had to wait until his girlfriend's sister arrived at the hospital to give him a ride to the courthouse. Parker argues there is no evidence that he had an alternate means of transportation that could have gotten him to the courthouse any faster. Parker testified that he contacted his defense counsel between 7 and 7:30 a.m. on Monday, March 11 and he exchanged text messages with his counsel throughout his hospital stay. According to Parker, his defense counsel knew that he was in the hospital being treated for chest pains, and although Parker did not provide his counsel with additional details, Peterson spoke to a nurse while Parker was being discharged, and the nurse told Peterson "everything." According to Parker, this evidence demonstrates that he had a legitimate medical reason for going to the emergency

14

room on March 11.  He argues he was in the hospital receiving treatment when court began at noon, and he voluntarily appeared in court within three hours of his hospital discharge.

The record reflects that Parker knew he was supposed to be in the courtroom by noon on Monday, March 11. Despite exchanging multiple text messages with his counsel that morning and knowing that his counsel needed specific detailed information to convey to the court, such as when his symptoms began, his diagnosis, and when he was going to be discharged, Parker only told his counsel that he was being transported to the hospital where he was being treated for chest pains. Parker thought he gave his counsel the name of the hospital, but defense counsel disputed that Parker provided him with this information or any of the additional information counsel requested.

The record reflects that Parker began experiencing chest pains after playing football with his children on March 10, but he did not seek medical care until his girlfriend was transported to the hospital the morning of trial on March 11 for pregnancy complications. According to Parker, his chest pains began again after his girlfriend's water broke, and he was dizzy and nauseated and thought he was having a heart attack. There is conflicting evidence regarding the severity of Parker's medical condition. Parker's medical records reflect that soon after he arrived at the hospital, he denied any nausea, vomiting, dizziness, or shortness of breath and he

15

reported that he was not experiencing any chest pain. He was given an aspirin and "discharged home as no acute need for admission." Parker, who was on bond, was taken to the same hospital as his girlfriend, which he could not otherwise have done on his own because he was on house arrest.

The record reflects that when trial resumed on March 11, the jury was seated at 1:10 p.m. After the State closed its case and the defense presented its only witness, the trial court recessed for trial for lunch. Trial reconvened at 2:33 p.m. and closing arguments concluded at 3:50 p.m., at which time the jury began its deliberations. The evidence reflects that Parker was discharged from the hospital at 1:40 p.m. and that the hospital was within walking distance of the courthouse. Parker, however, did not arrive at the courthouse until 4:15 p.m.—more than two hours after his discharge. Parker was not in the courtroom when closing arguments concluded and the jury began deliberating at 3:50 p.m. The trial court had discretion to reopen the evidence at any time before closing arguments ended. *See Swanner v. State*, 499 S.W.3d 916, 920 (Tex. App.—Houston [14th Dist.] 2016, no pet.) ("Article 36.02 does not limit a trial court's discretion to reopen a case at any time before argument has concluded. The statute merely mandates certain circumstances in which a trial court is *required* to reopen the evidence before argument is concluded.") (internal citation omitted); TEX. CODE CRIM. PROC. art. 36.02 ("The court shall allow testimony to be introduced at any time before the argument of a cause is concluded,

16

if it appears that it is necessary to a due administration of justice."). Thus, had Parker arrived at court as little as thirty minutes sooner (at 3:45 p.m.), the trial court would have been able to reopen the evidence to allow Parker to testify.

Although Parker argues that there is no evidence he could have arrived at the courthouse sooner, it was Parker's burden to provide evidence refuting the trial court's finding that he was voluntarily absent. Parker acknowledged that the hospital was within walking distance of the courthouse, and he testified that he wanted to walk to the courthouse, but he chose instead to wait for approximately one hour for his girlfriend's sister to give him a ride because he did not think that his counsel would want him to walk. Although Parker testified that he contacted multiple people to request a ride to the courthouse, he did not ask his defense counsel to assist him, even though he was in contact with his counsel and Peterson.

The trial court could have reasonably inferred from this evidence that Parker was not experiencing an unexpected medical emergency that was of such severity that it necessitated immediate medical care and prevented him from appearing for trial the morning of March 11, and despite his hospitalization, Parker could have arrived at court in time for the trial judge to reopen the evidence to allow Parker to testify.

Based on the record before us, we cannot say that Parker presented evidence refuting the trial court's finding that he voluntarily absented himself during trial on

17

March 11. *See generally Nauls v. State*, 762 S.W.2d 336, 338 (Tex. App.—San Antonio 1988, no pet.) (holding appellant failed to refute finding of voluntary absence when among other things defendant failed to notify court and his counsel that he had taken his girlfriend to hospital and record "clearly reflects that appellant, of his own volition, made the decisions not to communicate with the court on the morning of trial"); *Vasquez Mata v. State*, No. 13-01-00743-CR, 2002 WL 1765582, at *2 (Tex. App.—Corpus Christi–Edinburg Aug. 1, 2002, no pet.) (mem. op., not designated for publication) (holding appellant failed to refute finding of voluntary absence when among other things there was "no evidence in the record that appellant's medical condition, subsequent to her release, prevented her from attending the trial").[6]

We thus conclude that the court did not abuse its discretion in finding that Parker was voluntarily absent from trial on March 11 and proceeding without him. *See* TEX. CODE CRIM. PROC. art. 33.03; *Moore*, 670 S.W.2d at 261 (stating trial court

---

[6]     Parker argues that the State's reliance on *Moore v. State*, 670 S.W.2d 259 (Tex. Crim. App. 1984), *Nauls v. State*, 762 S.W.2d 336 (Tex. App.—San Antonio 1988, no pet.), *Vasquez Mata v. State*, No. 13-01-00743-CR, 2002 WL 1765582 (Tex. App.—Corpus Christi–Edinburg Aug. 1, 2002, no pet.) (not designated for publication) is misplaced because the facts in these cases are distinguishable from Parker's case. Although the facts in *Moore*, *Nauls*, and *Vasquez Mata* are different and none of these opinions are dispositive of whether Parker voluntarily absented himself from trial, these opinions are nonetheless instructive with respect to the applicable legal principles and the types of evidence appellate courts consider when determining whether a trial court abused its discretion by finding that a defendant's absence was voluntary.

18

does not abuse its discretion by proceeding with trial in defendant's absence so long as some evidence supports court's finding that defendant's absence is voluntary and appellate courts will not disturb trial court's finding defendant was voluntarily absent unless defendant presents evidence that refutes trial court's determination).

We overrule Parker's first issue.

## Ineffective Assistance of Counsel

In his second issue, Parker argues that his trial counsel rendered ineffective assistance of counsel by failing to file a written motion for continuance and failing to request a writ of attachment to secure Arroyo's presence at trial.

## A.    Standard of Review and Applicable Law

The Sixth Amendments of the United States Constitution and the Texas Constitution guarantee a criminal defendant the right to reasonably effective assistance of counsel. U.S. CONST. amend. VI; TEX. CONST. art. 1, § 10; *see Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011). The right to effective assistance of counsel requires objectively reasonable representation, not errorless performance. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *Lopez*, 343 S.W.3d at 142.

To establish that trial counsel provided ineffective assistance, an appellant bears the burden to demonstrate by a preponderance of the evidence that (1) counsel's performance was deficient, and (2) the deficient performance

prejudiced the defense. *Strickland*, 466 U.S. at 687; *Lopez*, 343 S.W.3d at 142. An appellant must establish both prongs before an appellate court will find counsel's representation to be ineffective. *Lopez*, 343 S.W.3d at 142 (citing *Strickland*, 466 U.S. at 687); *see Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009) ("An appellant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other prong.").

To satisfy the first prong, an appellant must show that his trial counsel's performance fell below an objective standard of reasonableness under the prevailing professional norms. *Strickland*, 466 U.S. at 687–88; *Lopez*, 343 S.W.3d at 142. This requirement can be difficult to meet since there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Under the second prong, an appellant must demonstrate prejudice or "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *see Lopez*, 343 S.W.3d at 142. A reasonable probability is one sufficient to undermine confidence in the outcome. *Lopez*, 343 S.W.3d at 142.

The Court of Criminal Appeals repeatedly has stated that trial counsel "should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective." *Menefield v. State*, 363 S.W.3d 591, 593 (Tex. Crim. App. 2012) (quoting *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005)). When

trial counsel is not provided an opportunity to explain his actions, we will not find that counsel's performance was deficient unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *Id.* (quoting *Goodspeed*, 187 S.W.3d at 392). Thus, where an appellate record is silent on why trial counsel failed to take certain actions, the appellant has "failed to rebut the presumption that trial counsel's decision was in some way—be it conceivable or not—reasonable." *Mata v. State*, 226 S.W.3d 425, 431 (Tex. Crim. App. 2007).

## B.     Written Motion for Continuance

Code of Criminal Procedure Article 29.03 provides that "[a] criminal action may be continued on the written motion of the State or of the defendant, upon sufficient cause shown; which cause shall be fully set forth in the motion." TEX. CODE CRIM. PROC. art. 29.03. Article 29.13 governs motions for continuance made after trial has started and provides that a continuance may be granted "when it is made to appear to the satisfaction of the court that by some unexpected occurrence since the trial began, which no reasonable diligence could have anticipated, the applicant is so taken by surprise that a fair trial cannot be had." *Id.* art. 29.13. When a defendant's motion for continuance is based on an absent witness, the motion must show that (1) the defendant exercised diligence to procure the witness's attendance, (2) the witness is not absent by the procurement or consent of the defense, (3) the motion is not made for delay, and (4) the facts expected to be proved by the witness.

*Harrison v. State*, 187 S.W.3d 429, 434 (Tex. Crim. App. 2005); TEX. CODE CRIM. PROC. art. 29.06. Even if the defendant makes the requisite showing, however, the trial court still may deny the continuance if the evidence does not indicate a probability that the witness can be secured by a postponement, or if it appears that a continuance, due to the absence of the witness, would delay the trial indefinitely. *See Rodriguez v. State*, 21 S.W.3d 562, 565–66 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd) (citing *Varela v. State*, 561 S.W.2d 186, 191 (Tex. Crim. App. 1978)).

Trial counsel stated that Arroyo was present for trial on Friday, March 8 and he waited for five hours to testify for the defense before being instructed to return at noon on the following Monday, March 11, when the defense would present its case in chief. Defense counsel informed the trial court that after Arroyo failed to appear in court by noon, his investigator attempted to contact Arroyo, but Arroyo did not return the investigator's calls, and Arroyo's whereabouts were unknown. According to defense counsel, he and his investigator spoke to Arroyo at length on Friday about the substance of his testimony and when Arroyo informed them that he had "some interview," defense counsel told Arroyo that his testimony was critical to the defense's case because he was the only witness who could testify about Ealy's violent character. Defense counsel stated that although Arroyo knew he was supposed to return for trial at noon on March 11 and knew about the importance of his testimony to the defense's case, Arroyo was nevertheless "gone." Defense

22

counsel orally moved for a continuance until the next morning to give them time to locate Arroyo, who hopefully would "somehow come out of the woodwork and be presented in court."

The record thus reflects that when defense counsel requested a continuance neither he nor his investigator knew of Arroyo's whereabouts and the investigator's attempts to reach Arroyo by phone had been unsuccessful. The trial court could have reasonably inferred that despite knowing the significance of his testimony, Arroyo chose not to appear for trial. Even assuming defense counsel had properly filed a written motion for continuance making the requisite showings, we cannot say that the trial court would have abused its discretion by denying the motion because the record does not indicate a probability that Arroyo's presence at trial could have been secured by a postponement until the next morning. *See Rodriguez*, 21 S.W.3d at 565–66 (holding trial court did not abuse its discretion in denying motion for continuance when appellant had no knowledge of witness's whereabouts and record did not show probability that witness who had voluntarily appeared on prior occasions would have been located if continuance was granted).

Because Parker has not shown that the trial court would have abused its discretion by denying a properly filed written motion for continuance, Parker did not meet his burden to prove that his counsel's performance was deficient in failing to file a written motion for continuance. *See Richardson v. State*, 606 S.W.3d 375, 384

(Tex. App.—Houston [1st Dist.] 2020, pet. ref'd) ("To establish ineffective assistance of counsel, the appellant must demonstrate that the trial court would have erred in denying a properly filed written motion.").

Furthermore, there is nothing in the record indicating that the trial court would have granted defense counsel's motion for continuance had it been in writing. *See Sampson v. State*, 689 S.W.2d 498, 500 (Tex. App.—Houston [14th Dist.] 1985, no pet.) (concluding that trial counsel was not ineffective for failing to file written motion for continuance where "the trial court considered the merits of the oral request for continuance").

## C.     Writ of Attachment

Article 24.12 of the Code of Criminal Procedure provides:

> When a witness who resides in the county of the prosecution has been duly served with a subpoena to appear and testify in any criminal action or proceeding fails to so appear, the attorney representing the state or the defendant may request that the court issue an attachment for the witness.

TEX. CODE CRIM. PROC. art. 24.12.

After the trial court denied defense counsel's motion to continue the trial until the next morning to give him time to locate Arroyo, defense counsel told the trial court that although Arroyo had been subpoenaed and was attachable if he could be located, "it wouldn't happen within the constraints of getting to this jury today" and counsel had "no reason to believe it would." When asked during the hearing on

24

Parker's motion for new trial why he did not request a writ of attachment, defense counsel testified that he "didn't think that attachment would actually get [Arroyo] present here during the trial."

Once the trial court denied defense counsel's motion for continuance, defense counsel reasonably could have determined that it would have been futile to request a writ of attachment because Arroyo's whereabouts were unknown and he could not be located before closing arguments concluded on March 11.[7] *See Ex parte Chandler*, 182 S.W.3d 350, 356 (Tex. Crim. App. 2005) ("But a reasonably competent counsel need not perform a useless or futile act."); *In re A. D.*, 673 S.W.3d 704, 722 (Tex. App.—Austin 2023, no pet.) (holding that counsel not shown to be deficient for failing to object when trial counsel reasonably could have determined that any objection would have been futile); *see also In re K.L.L.H*, No. 06–09–00067–CV, 2010 WL 87043, at *7 (Tex. App.—Texarkana Jan. 12, 2010, pet. denied) (mem. op.) (holding that counsel not shown to be deficient for failing to request trial continuance when counsel may have believed, under the circumstances, such request would have been futile). Furthermore, even if Parker had met his burden to show that his defense counsel's failure to request a writ of attachment fell below an objective standard of reasonableness, Parker cannot prevail on his ineffective

---

[7] The trial court had discretion to reopen the evidence at any time before closing arguments ended. *See Swanner v. State*, 499 S.W.3d 916, 920 (Tex. App.—Houston [14th Dist.] 2016, no pet.).

assistance claim unless he also demonstrates prejudice or "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The record reflects that even if the court had issued a writ of attachment, given the time constraints and defense counsel's statements that Arroyo's whereabouts were unknown, the writ most likely would not have been sufficient to secure Arroyo's presence at trial while the trial court had discretion to reopen the case to allow Arroyo to testify.

We thus conclude that Parker did not meet his burden to show he was prejudiced by his trial court's failure to request a writ of attachment or that there is a reasonable probability that the outcome of the trial would have been different but for defense counsel's failure to request the writ. *See id.*; *see also Lopez*, 343 S.W.3d at 142 (stating reasonable probability is one sufficient to undermine confidence in the outcome).

We overrule Parker's second issue.

## Criminal Bill of Cost

In his third issue, Parker argues that the trial court erred in assessing $185 for Consolidated Court Cost-State and $105 for Consolidated Court Cost-Local because those costs were imposed under provisions of the Local Government Code that took effect on January 1, 2020, after the offense was committed on August 22, 2019. *See* TEX. LOC. GOV'T CODE §§ 133.102(a), 134.101(a) (collectively, "Cost Act"). Parker

26

thus requests that we modify the criminal bill of cost to (1) reflect the imposition of $133 for Consolidated Court Cost-State as authorized by the version of Section 133.102(a) in effect when the offense was committed, and (2) delete the imposition of $105 in Consolidated Court Cost-Local because Section 134.101(a), which was added by amendment in 2019, applies only to offenses committed on or after January 1, 2020.

Citing to *Bradshaw v. State*, 707 S.W.3d 412 (Tex. Crim. App. 2024), the State argues that the amount of court costs must be based on the law in effect on the date of conviction, not the date of the offense, and thus the trial court properly assessed the amount of state and local consolidated court costs based on the current version of the Cost Act. We agree. In *Bradshaw*, which was issued after Parker filed his brief, the Texas Court of Criminal Appeals construed the "transition and effective date" clause of Section 133.102(a). *See Joseph v. State*, No. 01-23-00937-CR, 2025 WL 714982 (Tex. App.—Houston [1st Dist.] Mar. 6, 2025, no pet.) (mem. op., not designated for publication) (discussing *Bradshaw*). Reconciling the language in Section 51.608 of the Government Code ("Imposition of Court Costs in Criminal Proceedings")[8] with the enabling language of Section 133.102(a), the *Bradshaw*

---

[8] Section 51.608 of the Government Code provides:

> Notwithstanding any other law that establishes the amount of a court cost collected by the clerk of a district, county, or statutory county court from a defendant in a criminal proceeding based on the law in effect on the date the offense was committed, the amount of the court cost imposed on the

Court held that "based on a plain reading of the statute," Section 51.608 trumps the transition and effective date clause of Section 133.102(a). *See Bradshaw*, 707 S.W.3d at 417. Because Section 51.608 states that "the amount of court costs must be based on the law 'in effect' on the *date of conviction*," the court held that "anyone who committed an offense before 1/1/2020 but is convicted after 1/1/2020, such as [Bradshaw], is subject to the current version of the [Section 133.102(a)]." *Id.* at 417–18 (emphasis in original).

Pursuant to *Bradshaw*, Parker is subject to the version of Section 133.102(a) in effect at the time of his conviction in March 2024, which imposes a $185 state consolidated court cost for a felony, and Section 134.102(a), which imposes a $105 local consolidated court cost for a felony, and thus the trial court did not err by assessing these costs against Parker. *See* TEX. LOC. GOV'T CODE §§ 133.102(a), 134.101(a); *Bradshaw*, 707 S.W.3d at 417–18; *see also Joseph*, 2025 WL 714982, at *3 (applying *Bradshaw's* reasoning to local consolidated court cost under Section 134.101 and holding defendant who committed offense before January 1, 2020 but was convicted after January 1, 2020 was subject to $105 local consolidated court cost under Section 134.101).

---

defendant in a criminal proceeding must be the amount established under the law in effect on the date the defendant is convicted of the offense.

TEX. GOV'T CODE § 51.608.

We overrule Parker's third issue.

## Conclusion

We affirm the trial court's judgment.



Veronica Rivas-Molloy
Justice


Panel consists of Justices Rivas-Molloy, Johnson, and Dokupil.
Do not publish. TEX. R. APP. P. 47.2(b).